The Honorable, the Judges of the United States Court of Appeals for the 4th Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the 4th Circuit, are admonished to draw an eye and give their attention. For the Court is now sitting. God save the United States and this Honorable Court. All right. This morning we're going to hear ACLU v. Stirling. This is a special sitting. And we'll hear first from Mr. Chaney. You may begin whenever you're ready. Mr. Chaney, can you hear me? Yeah, sorry, Your Honor. I inadvertently closed the Zoom window. Good morning, and may it please the Court. My name is Alan Chaney, and I am here today on behalf of the ACLU of South Carolina. This case is not the— Mr. Chaney, just from the outset, I just want to be sure of a couple of grammars. You make no Sixth Amendment claim here. It's only a First Amendment claim. Is that correct? That is correct. And you bring this on behalf of the organization, not on behalf of Mr. Bowen or the other inmate? Correct. The plaintiff is just the organization. Don't need you to bring both classified and official charges. All right. Thank you. This case is not about freedom of the press. It is about freedom of speech. The South Carolina Department of Corrections Act bans more outgoing speech than any other prison system in the nation. It not only completely bans all real-time communications between prisoners and the press, but goes beyond that. It suppresses also the speech rights of lawyers, clergy, family members, and friends—that is, individuals who have access to prisoners—and keeps them from recording, disseminating, and publishing the speech to those individuals. Mr. Chaney, just a moment. You emphasize the press, and of course that is important, but don't our cases say that the press is to be treated like the public in this context? Yes, Judge Niemeyer, and that is exactly why I said that this is not about freedom of the press, but freedom of speech. So the District Court and the defendants here, Graves, Pell, and Bojany, those cases are very uniquely about the freedom of the press. And the Court repeatedly affirmed the ruling there, but simply that the press are not entitled under the freedom of the press clause in the First Amendment to special access beyond what is afforded. by the general public under the prison's general rules. In many cases, in some ways, this is the inverse of Pell. So Pell was a generally applicable policy that satisfied the First Amendment, where members of the press sought even greater access. This is a generally applicable policy that violates the First Amendment, where it encroaches on the free speech rights of individuals not part of the press—family members, friends, and lawyers. Can I ask a clarifying question there? I thought your complaint in your brief say that the ACLU wants to send its communications director, Mr. Bowers, to the prison to interview these folks in person and record the interviews and use that, not that the attorneys are doing the interviews or already have interviews, but that it is—the ACLU does a lot. It has attorneys and it has communications and press people, and it's the communications, the members of the press, that want access in this case. Is that correct? A couple of—it's close, but not quite just rushing. What I would say is that we are—we do not specifically articulate the mechanics through which we would want to conduct this interview. So we mentioned, for example, that we are able to interview Mr. Bowers and our other clients in custody, even those that are not our clients. We can interview them through video calls over the telephone and in person. So I have it on page 9 of your brief. You say that you want to send your communications director, Mr. Bowers, to interview Bowman and the other inmate and make audio recordings of those interviews and publish them in a podcast and in writing. It just simply says the interviews would be conducted by Paul Bowers. I did not mean to suggest that we need him to physically enter the facility to conduct this interview, and that's part of why this is not an access case. We don't actually need anything from SEGC to do the plain activities. We can call Mr. Bowman, for example, on the phone already. As the Court is aware, both phone and video calls already have recording functionality. So unlike now in antiprogeny, where reporters were asking for the prison system to indulge in special permissions for certain individuals, we're not asking for that here. We don't need anything from SEGC to conduct our plain activities, except for our prison system. Let me ask you about that. I gather what you're doing is you're basically blurring ACLU's function as an attorney and ACLU's function as a journalist. In your complaint, you clearly articulate that you want a journalist to have access to interview, record, and publish. And so I guess just to follow up on Judge Washington's question, if we were to recognize the distinct roles of ACLU in which it's functioning as a journalist, would you be entitled, or do we have any case law that suggests you would be entitled to access based on your role as an attorney, and then convert that into a journalistic function? And, Judge Niemeyer, I don't think the question is whether as a legal matter we are entitled to access. I'm quite the contrary. I think the question is... Well, I understand that issue. That begs the question whether we should analyze this under the First Amendment or under access. And if it's under access, you're making the point that you already have access, so this is really a First Amendment case. And I think the questions being posed to you suggest you explore the possibility that you are also requesting access in your role as a journalist, which means your role as a journalist is no more privileged than the public. So whether you do it by telephone or you do it in person or whatever, if the public could do that, fine. That would be the distinction. I'm not suggesting you're not right that you, as an institution, you couldn't have access as a lawyer and then treat it as a publication. I know your argument is it doesn't make any difference because the lawyers would serve as that function. They could do the interview. But that isn't what you were mentioning in your complaint. Your complaint alleges you hired a fowler and you want him to do the interview and the publication and so forth. And, Your Honor, the question isn't whether the public at large has permission but whether the CDC has supported permission. So as was the case until, as is always the case, prisons afford access to certain individuals based on their discretion. So, for example, many family members, friends, lawyers, clergy have access to prisoners. Here we're saying we have access. It happens to be the case that they have access. What ground do you have access? What ground do you have access? If you set aside your attorney relationship, attorney-client relationship, set that aside just for the moment. I know it's hypothetical for you. But if you set that aside, what is the basis for your access? Setting aside the access I already have. I already have, as attorney-client. I already have this, in general. The access to your attorney-client relationship. I'm trying to get there, Your Honor. If Mr. Ballard wanted to interview Mr. Bowman without me and without any pretense of it being attorney-client related, Mr. Bowman could simply ask the CDC to add him to his contact list. He has, right now, in public work, 20 individuals that he can call him and that they can call him. Mr. Bowers could be added to that list. I believe that there's a maximum of 20 for Mr. Bowman, given his conditions of confinement. Have you alleged that he requested a journalist to come in and that the journalist was denied request? No, I have not. We've not needed to. Because, as I said, as a matter of fact, we have access already. Certainly, this case could have been brought by a family member or friend of Mr. Bowman that wanted to do exactly the same thing. They don't have the same factual claims that we have. They don't have the same institutional interest in sharing the information that Mr. Bowman also wants to share. It is a unique fact about our case that our access, at the moment, is based on our legal relationship. But I don't believe it's one that's paused about the legal issue. Let me assume. Let's get over that issue. I understand that issue very clearly. Let's assume you have access. Then, your argument, it's a First Amendment case. And you would agree that Turner applies to that? I would not, Your Honor. And the reason why is that the justification for this policy is exclusively based on things happening outside the prison. So, this is a restriction on outgoing speech, on speech leaving the prison. And under Thornburg v. Abbott, Martinez continues to apply to outgoing speech. I don't think you're right about it just affecting the outside. The argument, they have a list of reasons. And the argument, one of the main ones that seems to stick out is that this would create a notoriety for this particular inmate, which is a prison, a legitimate, penological issue. There would also be others as they talk about prison resources and the fact that there are other avenues for this. But address that notoriety, which it does not fall into the category that it's external from the prison. Sure. The notoriety was raised in the affidavit from Mr. Antonelli, who does not. I would encourage the court to look closely at that affidavit. It does not assert that concerns about notoriety are actually animating this policy. It merely says that if the CDC did not enforce any restrictions on the publication of inmate speech. Let's assume we realize that the notoriety is an issue. Take us there. Yeah, I would say that this is it furthers too little and suppresses too much, Your Honor. So, for example, as is in the record already, CDC already provides recorded conversations of its most notorious prisoners to the press. It did so for Mr. Murdoch. It both punished Mr. Murdoch and Mr. Murdoch's attorney for sharing a publication, sharing a recording of his speech, while at the same time providing other phone call, recorded phone calls to the press of Mr. Murdoch. The same thing happened with Susan Smith subsequent to the end of briefing here. And so the prison can't have it both ways. It can't say the only way we can enforce this categorical sweeping ban. Oh, by the way, this is the only prison system in the country that enforces it this way. But this is the only way we can ensure that there isn't notoriety. On the other hand, providing recordings to the press of its most notorious prisoners. Does the court have any follow up questions to that on now? Okay. I do want to make sure that we don't lose sight of the 12 v6 issue here and that there's both a facial challenge and as applied challenge. Under the 12 v6 issue. It really is a simple one. The question is merely whether under Martinez or Turner can a prison enforce a sweeping categorical restriction on speech based on a non penological interest in shielding crime victims from potentially observing speech that they might find upsetting. Taking our well pleaded allegations as true. The challenge policy violates the first prong of Turner and Martinez in the district court was wrong to dismiss council and making this argument. You're assuming that the issues Judge Niemeyer asked you about raising of notoriety within the present setting and the disruption that can cause to prison life are not viable rationales. For the purposes of 12 v6, the court should look at the complaint. The well pleaded allegations contained then they're in. And what we assert, and we use defendant director Sterling's own public representations to make this allegation is that the, the policy being challenged here is rooted in victims rights. And is meant to ensure that crime victims do not receive upsetting speech. That is the only justification publicly put forward by defendants Sterling until he was sued about this. And it's the only allegation contained in the complaint. So, for the purposes of the motion to dismiss. I mean, that's that's a little bit complaint. That's like a little bit like the Congress passing a law, and then one congressman comes out who sponsored the law and explains what it means. It seems to me a policy is a policy and we read the policy on its face. Sure, it's maybe evidence to have somebody explain what he thought was the best or the most serious issue that the policy protected, but it certainly wouldn't exclude other matters that are inherent in the policy. Two responses to that, judge, the first is that under 12 v6, the court should look to the four corners of the complaint for the factual assertions contained there and certainly at a summary judgment stage or at a trial, we would have the burden to prove. I guess the defendants actually have the burden to prove what the actual interests are and our burden of persuasion would apply. But, but even beyond that, it's not, I would reject the hypothetical that this is like one elected official explaining a policy to which he voted for. This is a First Amendment issue. And so there's always concerns of chill. And so when the, the leading enforcement entity is publicly declaring this is what our policy does. And this is why it does that. Chill emanates from that really aggressive explanation of what's prohibited in a way that doesn't, it isn't true of a individual legislator saying what a policy they voted for it does or does not do. I see that my time is up. Yeah. Thank you, Mr. All right, Mr. Hall, we'll hear from you. Good morning, Judge Niemeyer, members of the court, and may it please the court. I have a privilege of representing Mr. Sterling in his official capacity as the executive director of Department of Corrections. You'll hear me refer to SCDC rather than rather than director, but obviously I mean them interchangeably here. The tug of war that we seem to be having is one of access versus publication. And when the case law is construed and you look at Pell, Saxby, and Halchins, all of which involved press access, media access, the holding is clear, and that is that the press doesn't get any additional rights than that which the public gets. Judge Niemeyer. Let me ask you this question. I understand that. We understand those cases and that's one of your big prongs is access. The argument, I guess, is the ACLU has several functions as an institution. One of them is to represent clients and the other is to engage in public discourse and public debate on the death penalty. And they say that they have access by reason of their attorney client privilege with Mr. Bowman. And then they're going to use that access to carry out another function, which is the journalistic function. How do you address that? Your Honor, first, the the regulation itself, when it speaks of attorney access, makes it clear that it is for the purposes of interviewing inmates for purposes of an investigation or pending legal action. So they say they have access, but they have access for the purposes of the attorney client function. They make clear in the complaint at paragraph 28 that when Bowers interviews individuals that the ACLU represents in an attorney client capacity, he does not give legal advice and the ACLU does not claim attorney client privilege or other protections that attach to attorney client communications. So they're trying to have it both ways. It was unclear, I will say, from the briefs, I think the court may have seen sort of a modulation of the capacity in which the ACLU speaks. It was clear in the complaint that it was absolutely in the news gathering context and that began to morph a little bit in the reply brief. If you look at just the attorney hat, they make it clear in the complaint that they don't come wearing that attorney hat. And if they did, the reg says that attorney hat can only be utilized for the purposes of an investigation or pending legal action. So they wouldn't actually have access to masquerade as an attorney, but really be in the news gathering reporter context. Your Honor, can y'all hear me? Yes. Yes. Okay. You may proceed. Your transmission video transmission is quite poor. It's delayed and it's fractured, but we hear your voice. Okay, I'm sorry. If you would like, I can turn camera off. I don't know if that would help. Okay. Your Honor, I would go on to say that even if when you look at Martinez and you look at Safley, each of those really construe inmate rights. In neither of those cases do you have press plaintiffs. What you have is a discussion, for instance, in Turner about inmate to inmate correspondence. And in Martinez, obviously you've got a class action about prison mail censorship. Neither of those cases address the external dimension of a news gathering organization coming in. And when you get to Halchins, the court made clear again in 1978 that the press gets only what the public gets. And the Halchins court was very clear to distinguish Grosjean and Mills that dealt with the freedom of press to communicate information and said, hey, that's not what this is. This is about access. I would also point out in the Saxby holding the court says it's unnecessary to engage in any delicate balancing of such people considerations against the legitimate demands of the First Amendment. And as the court knows that was a 5-4 decision. And Justice Powell was the swinging vote in each of those. He was in the minority and dissented in Saxby on the media dimension in the Pell case. He also dissented making the media portion of 5-4 decision. And yet the inmate portion of 6-3 decision. So I don't think there's any lack of clarity about where the rub is in those cases. I went back and listened to the oral arguments in each of those cases. And it's clear that the access issue is where the court loses Judge Powell and creates the 5-4 decision. Counsel. Yes, Your Honor. Sorry to cut you off. Can you address the telephone access point that your friend on the other side was making? Well, it is true. Again, I think the first question I would ask myself, what hat are they wearing? Let's assume for a moment they're wearing the attorney-client hat. In the attorney-client context, obviously lawyers have unsupervised or un-listened to communication with their clients in incarceration. But again, they are in that legal capacity of an investigation of pending legal action and the policy does not allow them to just go publish that. The plaintiffs point to the Murdoch example where the lawyer either misunderstood or misused the attorney-client access and attempted to broadcast that right. That obviously is violative of the policy. So again, that fits still in the Pell-Saxby-Halchins rubric because it's not legitimate or legally obtained information. It's obtained by either mistake, inadvertence, or by simply violating the regulation. Can the general public access Mr. Bowman by phone? The general public can, within certain instances, have access with inmates. As Mr. Cheney alluded to, it varies from facility to facility. Let me interrupt you. I think the question is focusing on the distinction between physical access into the prison as opposed to a telephone call. And the question is, does the public have telephone access to Mr. Bowman, which would include the press? It does not have telephone access that would allow it to record and broadcast those communications. I'll refer to the example in the brief about the happy birthday call. The notion is that if a prisoner were to leave a happy birthday message or sing happy birthday to a family member, that it would be outrageous for that to be something you couldn't put on your Facebook page. But again, the penological interests include concerns about articulating to others outside the prison activities that could affect the inside of the prison. Gang-related violence, coordination of crime, escape plans, coded messages. So is your point that even the general public, even those members of the general public who are allowed to speak to Mr. Bowman, if they exist, I'm not sure what the policy is outside of friends and family. I don't know that we have that in front of us. But even those individuals cannot record and publish the conversation? Is that what you're saying? That is correct, Your Honor. And we cite to those provisions in the record. You have at the Joint Appendix 56 through 58 provisions that speak to the prohibition on recording audio or video for anyone who has access. So your view of the policy is that while it may permit some form of general access by the general public, there is no dispensation to publish anything that the general public may glean from that telephone access? Yes, Your Honor. Let me make two points there. First, when I say general public, I don't mean I can just call anybody. I'm referring to people who are approved to communicate with the inmate. So I can't just call the prison and say, hey, I'd like to speak to inmate X. Can you get him on the phone? Inmate X can have certain family members, clergy, others on a list. That's the subset about which I'm speaking. And with regard to that subset, Your Honor, no, they cannot record audio or visual, in this case audio, and republish or rebroadcast that. That's the point that I'm trying to make. So I take it your argument would be that in that context, the general public is treated no differently than the press would be? Absolutely. Absolutely. And again, the reasons for that, the rationale is obvious. I articulated some of the concerns about security and order. But imagine for a moment, if every one of those communications had to be monitored or had to be on delay. Imagine the resources that would be required for the Department of Corrections if that were the case. If you've got an incitement of gang violence or you've got a call to do harm to a witness, if that were to be included in that communication, how would you prevent that? Well, you presumably, I guess, could be like the old days of mostly live TV where you had a six or seven second delay and somebody bleeped or cut the communication. Imagine the demands on prison resources if that were the case. And so again, it makes rational sense as well as legal sense why the prohibition exists. As a factual matter, is there a date set for this execution? I think originally the papers included a date, but now maybe that's up in the air. Do you know? Your Honor, Mr. Cheney and I had a discussion about that this morning and the date was set for the 6th of next month. Mr. Cheney alerted me this morning by phone call that an order had not issued from the Supreme Court last Friday as he anticipated and asked, hey, has the date changed? And the answer to his question and Your Honor's question is I just simply don't know the answer. Okay, so I thought there was a representation somewhere the execution was set for November 29th. Your Honor, if the court will indulge me, I don't believe the date of the execution is relevant to the legal analysis and so I've not focused there. I believe Mr. Cheney may be able to address that better than I can in terms of that sequence. Right. Any further? Your Honor, that's it unless the court has additional questions. All right. Thank you, Mr. Hall. Mr. Cheney. Thank you, Your Honor, and I just I want to clarify the record about the execution date as best as I can. When we filed our briefing and represented that it was November 29th, that was the information that was being distributed publicly. That date changed to December 6th. But the way South Carolina works is a death warrant is issued four weeks in advance by the state Supreme Court. The date that that would have happened was this most recent Friday and a death warrant did not issue. And so we are somewhat in limbo. There are pending arguments before the state Supreme Court about delaying further executions through the holiday season. The court hasn't taken any action on, but I did want to update the court about the status of the execution date is not as certain as we originally thought and had represented. It is the case that Mr. Bowman is now the very next person in line. And so the next execution that occurs in South Carolina will be of Mr. Bowman. So I as I understand it, then just this is a pragmatic matter because we want to consider this and and the better time we have to consider it is better for the court and for you for counsel. But as I understand it, even the December 6 date now is passed because there's been no warrant. So it's at minimum of December 6, but it's clearly the four weeks can't be honored for that. And so it's sometime beyond the six. Is that correct? That's my understanding of the law. I don't do capital representation in this state, but my understanding is that now the soonest it would be is four weeks from this coming Friday. Okay. I didn't want to hit a couple points on rebuttal. And the first point is just again on the. The fact that there's a facial overbreath challenge. So on the 12 V6 question, it is whether a non-penal interest here protecting crime victims from observing potentially upsetting speech. Can be used to justify a sweeping and categorical restriction on First Amendment rights of both prisoners and non prisoners. And on this facial claim, the court does not just look to the rights of South Carolina, but also to the other speakers affected by this policy prisoners and non prisoners alike. Because this justification doesn't survive Turner or Martinez on the first prongs of either the district court was wrong to dismiss the claim the court should reverse. The second thing I wanted to bring up is just the staggering hypocrisy of how a CDC enforces this policy. On the one hand, they argue that a categorical ban is the only way to achieve their security interests. But on the other, they routinely disseminate recordings of conversations with CDC's most high profile prisoners directly to the news media. And then more recently, and this isn't in the factual record because it just came out. I believe earlier this week, potentially last week, a piece came out from a local news outlet showing the CDC is more than willing to allow prisoners to be directly interviewed by the news media if it fits their ends. And the piece by News 19 CDC allowed a video interview with an SEDC prisoner for the purposes of extolling a prison program that allows incarcerated people to work with retired racehorses. Finally, I wanted to bring up something from the let me ask you about that question. It seems to me if we accept the notion that notoriety is one of the issues inherent in the policy and that notoriety can lead to cliques and uprisings and organization of prisoners and discrimination among prisoners. It seems to me if the interview is about a prison policy that's working, that the prisoners are satisfied with, the state's satisfied with, that would be something beyond and different from the policy consideration. I mean, basically, your organization makes no bones about it. You want to address the capital punishment issue and increase the public debate, which is all very legitimate. But the question is whether that serves the prison policies, whether that interferes with the penalogical interests. Yeah, and I'm saying that SEDC has already determined that it does not. And so, in releasing these recorded conversations of Ms. Smith and Mr. Murdoch. Where have they determined that, that it's not? So, in order to release the material under our state FOIA statute, which is how they represent their allowing the press to have access to that, it relies on a determination that it does not affect internal prison security or administration. There's a specific FOIA exemption that allows SEDC or other state actors to withhold information if it implicates those concerns. And so, by sharing these recorded conversations with its most notorious prisoners, SEDC is making a value determination based on its discretion on security order and rehabilitation, that disclosing those recordings does not implicate those interests. The last thing I wanted to get to before I run out of time is this voice actor argument that was raised in defendant's brief. And with respect to Mr. Hall, I think that sort of gives away the game. By conceding that SEDC does not have an interest in suppressing the actual information being conveyed, only the sound of a prisoner's voice, that's a stunning admission. The sound of a prisoner's voice does not raise new security concerns. It raises no issues of prison resources. It has no role in rehabilitation. By agreeing that this is about who is saying it and not the penalogical interests around what is being said, SEDC is confessing that the policy violates the First Amendment. All right. Thank you, Mr. Cheney. Thank you for the arguments. We are happy to have been able to schedule this special session with the cooperation of counsel. And, of course, counsel have both made very fine arguments. We'll take it under advisement and send out an opinion on this. Many thanks, and if the clerk will adjourn court, appreciate it. Thank you, Your Honors. This honorable court stands adjourned. Seen and I. God save the United States and this honorable court.
judges: Paul V. Niemeyer, G. Steven Agee, Allison J. Rushing